## Albert A. West *et al.* Administrators,

*v.*

## Hiram S. Reed.

1. Mortgagor and mortgagee—*of a release of the equity of redemption by the former to the latter.* While it is true, that contracts between mortgagor and mortgagee for the purchase or extinguishment of the equity of redemption are regarded with jealousy by courts of equity, and will be set aside if the mortgagee has, in any way, availed himself of his position to obtain an advantage over the mortgagor, yet this principle does not preclude any *bona fide* agreement between the parties which shall operate to vest the entire estate in the premises in the mortgagee, and mere inadequacy of consideration will not, of itself, deprive such an agreement of its binding effect.

2. Same—*of the mode of releasing the equity of redemption.* Although the original transaction between a mortgagor and mortgagee was not in form a mortgage, but an absolute deed, with a bond to re-convey on the payment of the money at a specified time, still, it is not essential to the proper extinguishment of the right of redemption, by an arrangement between the parties themselves, that it should be done by an instrument which will operate as a technical conveyance of the mortgagor's estate in the land; but if such transactions occur between the parties as would render it inequitable that the grantor should be permitted to redeem, that, of itself, without assuming the form of a technical release, will operate as a cancellation of the instrument of defeasance, and give to the deed the effect of an original, absolute conveyance as between the parties.

Appeal from the Circuit Court of Kane county; the Hon. E. S. Williams, Judge, presiding.

The opinion states the case.

Messrs. Mayborne & Brown, for the appellants.

Mr. Charles D. F. Smith, for the appellee.

Mr. Chief Justice Lawrence delivered the opinion of the Court:

This litigation arose out of the following state of facts:

In April, 1850, Reed, the appellee, applied to West, a banker, for the loan of $500. West declined to lend the money, but referred Reed to one Johnson, who agreed to lend the money if Reed would give security on his farm, and if West would promise to pay the money at maturity, in case of Reed's default. This arrangement was made. Reed received the money, and executed to Johnson an absolute deed of the farm, containing 380 acres, and Johnson gave back a bond, binding himself to re-convey in case Reed should repay the money, in two installments, the first falling due September 15, 1850, the second, January 1, 1851. Reed was unable to meet the first payment, and in pursuance of the agreement, West paid the money, and took a conveyance of the land from Johnson. The bond from Johnson to Reed had not been recorded, and Reed promised to bring it and deliver it to the attorney of West, but neglected to do so, and when the attorney subsequently mentioned it to him, he said he had mislaid it. West continued to furnish Reed with money, from time to time, until May 7, 1859, at which date they had a settlement. Reed was a bachelor, with no family, and it was agreed between him and West that the indebtedness should be cancelled, and Reed should abandon his right of redemption, and take from West a lease of the farm for his own life, subject only to a rent little more than nominal. The precise amount of the indebtedness we can not ascertain from the record, but it was probably between $1800 and $2000, and undoubtedly much less than the value of the land, even subject to Reed's life estate. The annual rent to be paid was ten bushels of wheat, ten bushels of corn, one fat hog, twelve chickens, and the taxes. West also surrendered to Reed about five hundred dollars' worth of notes, which were independent of the money paid Johnson, and the bank account. The agreement, as stated by Reed himself in his testimony, was, that all papers should be cancelled and all indebtedness given up, the object being, he says, "to secure me the possession of the land during my

244　　　WEST *et al. v.* REED.　　　[Sept. T.,

Opinion of the Court.

life time." At the same time with the execution of the lease, the parties executed the following instrument, written upon Reed's book of accounts, and designed to show the settlement and cancellation of the indebtedness:

" *May,* .7, 1859.

" We hereby certify that all matters herein mentioned and described, and all deal between us, are settled and cancelled ; the consideration of which, in part, is a lease, executed this day, of the Reed farm, in section 36, township 40, range 36.

[Signed]　　　　　　　　　　　　" W. B. WEST,

　　　　　　　　　　　　　　　　" H. S. REED."

From this date until 1865, the relations of the parties continued amicable, Reed expressing to his neighbors his entire satisfaction with the arrangement he had made, saying he would rather West should have the farm, after he was gone, than any one else, and that he could get money from West whenever he needed it. In the spring of 1865, Reed demanded a settlement from West, and a re-conveyance of the land, and about the same time, West brought an action against Reed for rent. This suit was subsequently dismissed, and in 1866 West filed a bill in chancery against Reed and Johnson to procure a correction in the certificates of acknowledgment of the deeds. Reed then filed his cross bill, to redeem the land, and the cause having been heard upon bill, answer, replication and proof the court decreed that Reed should be permitted to redeem upon payment of $1999.51, the sum found to be due by the master. To reverse this decree, the administrators of West, who has died, have prosecuted an appeal.

We do not dissent from the general principles urged by the counsel for appellee. It is settled beyond controversy, that contracts between mortgagor and mortgagee, for the purchase or extinguishment of the equity of redemption, are regarded with jealousy by courts of equity, and will be set aside if the mortgagee has, in any way, availed himself of his position to obtain an advantage over the mortgagor.

We do not, however, assent to the position, which we understand counsel for appellee to assume, that when the original transaction between the parties has not been in form a mortgage, but an absolute deed, with a bond to re-convey on the payment of the money at a specific time, the right of redemption can not be extinguished, except by an instrument which will operate as a technical conveyance of the mortgagor's estate in the land. : He undoubtedly has an estate, which will pass by descent, or devise, or by deed. But it is nevertheless a purely equitable estate, that is to say, an interest in the land based upon equitable grounds, and which a court of chancery will protect and enforce when equitable considerations demand. But he has nothing more. The legal title has gone to his grantee by means of a deed absolute upon its face. If the deed, as in the present case, was made to secure a loan of money, and a bond, or contract to re-convey, is taken, the transaction, in a court of equity, is regarded only as a mortgage. But we repeat, the naked legal title has vested in the grantee, and if such transactions subsequently occur between the parties as would render it inequitable that the grantor should be permitted to redeem, a court of equity will, of course, refuse to aid him, as it will always refuse its aid to perpetrate a wrong. It is wholly immaterial whether he has executed a technical release of his equitable interest to the grantee or not. He might have done that, and still be entitled to the aid of a court of equity, which looks to the substance of a transaction, and not to its form. And without having done that, he may have had such transactions with his grantee as would render it inequitable to compel the grantee to suffer a redemption. In such an event, the equitable estate is practically gone or annihilated without a release, because the equitable considerations upon which it rested are destroyed by the acts of the parties, and chancery will leave the legal title where they have placed it. The rule is laid down in Washburne on Real Property, that, although equity will not permit a mortgagee to embarrass or defeat the right of redemption by

an agreement into which the mortgagor may be induced to enter in order to effect the loan, yet this principle does not preclude any subsequent *bona fide* agreement between the parties, and where a mortgagor has, upon such subsequent agreement, voluntarily cancelled the instrument of defeasance held by him, it gives to the deed the effect of an original absolute conveyance as between the parties. 2 Wash. on Real Prop. 67, 3 Ed. The author cites numerous cases in support of this position.

In the case at bar, we are of opinion the complainant in the cross bill has no equities which a court can reasonably enforce. There is not a scintilla of evidence in the record tending to show that West, in any way, availed himself of his position as mortgagee to obtain this arrangement from Reed. Indeed, it does not appear that he sought an arrangement of any sort, or that he was, in any mode, holding out threats or appealing to the fears of Reed. On the contrary, it appears that for years before the execution of the instruments in 1859, the same understanding had verbally been had between them, and for six years subsequent to 1859, the arrangement continued in all respects satisfactory, at least to Reed. By the transaction of 1859, West not only cancelled his claims against Reed, but by the lease which he executed to him, he cut himself off from all claim for more than a nominal rent of the land during Reed's life. The cancellation of his claims, and the execution of the lease, could, of course, only have been consented to and carried out by West in consideration that Reed was to relinquish all right of redemption, and that this was the consideration, is shown by the testimony of both parties. It is objected, however, that the consideration was inadequate. As a matter of theory, and forming an opinion upon annuity tables, it probably was very inadequate, but that is not the only question. The parties themselves probably did not consider it so. By the arrangement, West was to go without either his money or the land, or income from either, during the life of Reed, which was very likely to outlast his own, as this record discloses it has. It is near twelve years since the transaction, and neither

West nor his estate has received either interest or rent of any moment, nor will any, except an almost nominal sum, be paid while Reed lives. Although life tables are a sufficiently safe guide in reference to a large number of persons in similar circumstances, and where the doctrine of averages can be applied, they are very unsafe in reference to an individual case. These parties bargained in the dark. Reed had no relatives for whom he cared, and, as he frequently said, West had been his friend, and he had rather West should have the farm when he was done with it, than any one else. By the arrangement made, he at once paid his debt and secured for himself a farm for life. Neither could say with certainty that he was gaining an advantage in the bargain, nor can this question be accurately settled by any one until Reed has followed West to the grave.

But as we have already admitted, judging by ordinary rules, the consideration was inadequate. Nevertheless, in his circumstances, it was satisfactory to Reed, and continued so for six years thereafter. The bargain was not pressed upon him. Tried by his own testimony; there was no taint of unfairness about it, and why a court should arbitrarily rescind such a bargain, years after it was made, simply because the parties were mortgagor and mortgagee, we are wholly at a loss to discover. As we have already said, it is true, courts watch transactions between such parties very closely in order to prevent oppression, but it would be folly to push this jealousy to such an extent as to authorize the mortgagor to repudiate at his discretion every contract he may make with the mortgagee. We are not aware why a privilege should be given to him that is given to no other person, not standing in a fiduciary relation. It is said, indeed, in Coventry's Notes to 1 Powell on Mort. 123, that a sale by a mortgagor to a mortgagee, stands on the same principle as a sale between parties having no connection with each other, and can only be impeached on the ground of fraud. The authorities apply a more rigid rule than this, but we understand the principle to be, that the mortgagee must have availed himself of his position to extort an unreasonable

advantage before a court will interfere to set aside the sale. If the parties deal at arms length with each other, without threats, oppression, compulsion or fraud, we do not know why a sale by the mortgagor of his equitable estate to the mortgagee should be rescinded, on the ground of inadequacy of consideration alone, any sooner than it would be if the sale had been to a third person.

In the present case, we see no ground for interference. Reed was as anxious to enter into this arrangement as West. There is no pretense of fraud, or compulsion, or oppression. Each party exercised his own judgment in making the bargain, and Reed remained satisfied with it for years. Tried by ordinary tests, the bargain was an unwise one, but it was peculiar, and it is possible the life estate of Reed may be of such long duration, that even the alleged inadequacy of consideration will nearly or quite have vanished. The bargain involved an element of uncertainty as to which each party was willing to take his own risks, and there was no unfairness which a court can make a ground of rescission. To grant the relief sought in this bill would certainly not tend to the preservation of good faith in the performance of contracts, and is not demanded by the equities of the case.

The decree must be reversed and the cause remanded.

*Decree reversed.*