EDWARD J. SCANLAN *et al.*

*v.*

TIMOTHY H. SCANLAN.

*Filed at Ottawa October 31, 1890.*

1. MORTGAGES—*deed absolute in form.* A deed absolute in form, if intended as a security, is, in equity, but a mortgage, and will be treated and enforced as such, even though the agreement for redemption rests only in parol, and notwithstanding the Statute of Frauds.

2. SAME—*mortgagor and mortgagee—dealings between them—vesting the entire estate in the latter.* Where a mortgage is in the form of an absolute conveyance, a *bona fide* agreement between the parties to vest the entire estate in the mortgagee will be sustained, and the execution of a formal deed will not be required, provided the transaction is fair, and not attended with oppression or fraud or undue influence, and the mortgagee has not availed himself of his position to obtain an advantage over the mortgagor.

3. Where a party holding the legal title of real estate as a security for loans and advances, purchases the equity of redemption of his debtor under circumstances showing no grounds for the surmise of any concealment or advantage taken of information acquired as mortgagee, and the consideration paid is an adequate one, a court of equity will not set such purchase aside.

4. SAME—*conveyance by trustee—equity of redemption reserved.* Where a trustee makes a sale of the mortgaged property to another, for the use of the former, and to cut off subsequent incumbrances and liens, with an agreement that the debtor may still redeem the property by paying the debt thereby secured, the legal effect of the trustee's deed will be merely to put the legal title in the grantee, and the equity will not be cut off, and a purchaser from the grantee in the trustee's deed, with notice of the facts, will also take subject to the right of redemption.

5. TRUSTS AND TRUSTEES—*trustee denying trust relation.* The denial by a trustee of the trust relation is a breach of trust and a flagrant fraud. It is a fraud which taints all his dealings with his *cestui que trust* made at or subsequent to the time of such denial, but it will not affect his prior acts and dealings.

6. SAME—*trustee and cestui que trust—dealings between them.* A trustee can not buy from himself, but may from his *cestui que trust,* if he so deals with him that he shakes off the obligation that attaches to him as trustee.

7. DOWER—*release of dower—as to equity of redemption.* The wife of the owner of the equity of redemption in land, who joins in a deed by her husband made on a sale of his interest, and also in the receipt for the price, will thereby be barred of her right of dower as against the purchaser.

8. CHANCERY—*numerous defenses—should be consistent.* A defendant in chancery may set up any number of defenses, but they must be consistent with each other. Though where inconsistent defenses are interposed, and no exception is taken on that account, and on the hearing one is found to be untrue and the other established, the decree will not be reversed on account of such untrue and inconsistent defense.

APPEAL from the Appellate Court for the First District;—heard in that court on writ of error to the Circuit Court of Cook County; the Hon. LORIN C. COLLINS, Judge, presiding.

This is a bill to redeem, prosecuted by Edward J. Scanlan and Nellie Scanlan, and to which Timothy H. Scanlan and Ann Scanlan were made defendants. The bill charges, in substance, that complainants are the only children and heirs of Jeremiah Scanlan, deceased; that said Jeremiah was the owner of the premises known as No. 424 State street, Chicago, and in 1874 executed to L. C. P. Freer a trust deed thereon to secure a note for $4000, borrowed money, and in 1875 executed to said Freer a second trust deed thereon to secure a note for $1000, borrowed money, and in 1876 executed to said Freer a third trust deed thereon, to secure another note for $1000, borrowed money, all of said notes drawing ten per cent interest; that said Freer, in March, 1879, he then being the real owner of all the notes, declared the $4000 note due for default in payment of taxes and interest, made a pretended sale of the premises to his son, Nathan M. Freer, under the power contained in the first trust deed, and executed to him a pretended trustee's deed; and that there was an agreement between Jeremiah and L. C. P. Freer that the former might at any time redeem by paying the amount due on all the loans, and that Nathan M. Freer made a declaration in writing to that effect. The bill further avers, in substance, that about

May 1, 1879, Timothy H. Scanlan, one of the defendants, agreed with Jeremiah, his brother, to advance and pay the sums of money necessary to get the title from Nathan M. Freer, and to convey to Jeremiah as soon as such advances were repaid, with interest; that on May 1, 1879, Timothy H. paid to L. C. P. Freer the sum of $7033.56, the amount of the indebtedness to that date, as follows: $4533.56 in cash, and $2500 by his note of that date, due in one year, drawing seven per cent interest, and secured by trust deed on the premises, and which note he paid on October 25, 1879; that on May 1, 1879, Nathan M. Freer made to Timothy H. a quit-claim deed for the premises, and on May 2, 1879, Jeremiah Scanlan, and Ann, his wife, also made to Timothy H. a quit-claim deed for the same. The bill also charges, in substance, that the premises were, at the time of these transactions, worth $20,000, and that Timothy H. took the same with full knowledge of the equitable rights of Jeremiah therein, and that he afterwards, and in the lifetime of Jeremiah, forcibly, and without the consent of Jeremiah, took actual possession of the land and buildings thereon, and has ever since received the rents thereof and paid the taxes out of the same. The bill claims that the deeds from L. C. P. Freer to Nathan M. Freer, and from Nathan M. Freer to Timothy H. Scanlan, did not bar the equity of redemption of Jeremiah Scanlan, but only operated to convey the legal title subject to such right of redemption, and that the quitclaim deed of May 2, 1879, was only intended as a security. The bill also states that Jeremiah Scanlan died intestate, in 1880; that the co-defendant, Ann Scanlan, is his widow; that at the time of his death the complainant Nellie Scanlan was in the nineteenth year of her age, and the complainant Edward J. Scanlan in the seventeenth year of his age, and that the complainants were ignorant of the rights and equities vested in them until they discovered the same shortly before filing the bill.

Ann Scanlan answered the bill, admitting all its material allegations, and also filed a cross-bill, claiming that she was entitled to dower, and praying that it might be assigned to her.

The answer of Timothy H. Scanlan to the cross-bill set up the deed of May 2, 1879, in bar of dower, and also that in October of the same year Ann Scanlan executed and delivered to him "a further release and relinquishment of her inchoate right of dower," and also *laches* on her part, and that she was barred by the seven years' limitation law.

The answer of Timothy H. Scanlan to the original bill claims that he purchased the land from Nathan M. Freer in good faith, for a valuable consideration, and without notice of any legal or equitable interest of Jeremiah Scanlan therein; that L. C. P. Freer was not the owner of any of the notes in the bill mentioned, at the time he made the sale under the trust deed; that Nathan M. was then the owner of the $4000 note, and in consideration of such sale delivered the same up to the trustee for cancellation; that he had no notice of any agreement between said L. C. P. Freer and Jeremiah that the latter might redeem after such sale, denies there was any agreement to that effect, and claims that if there was such agreement it was not in writing, as required by the statute, and was without consideration, and that he took the land without notice of any declaration of trust made by Nathan M. The answer further claims that the trustee's deed to Nathan M. was valid, and conveyed the absolute title to the property, and barred the equity of redemption; that the quitclaim deed of May 2, 1879, was not made by Jeremiah and his wife as security, but that it was made merely to confirm and ratify the deed to Nathan M. and the deed from Nathan M.; that he, defendant, did not take forcible possession of the premises, but that Jeremiah voluntarily gave up possession to him, and that he has ever since been in possession under claim of absolute ownership, and that from May 2, 1879, to the time of his death, Jeremiah never pretended or claimed that defendant held the

land in trust or as security, but recognized him as absolute owner. The answer denies that Jeremiah applied to said defendant to redeem the land, or that the latter either agreed to or did advance any money for that purpose, or that the conveyance from Nathan M. was made in pursuance of any arrangement to hold the title as security, or that he agreed to pay for Jeremiah such moneys as might be necessary to get the title and hold the same as security for advances then or thereafter made, and to reconvey the same when such advances were repaid, with interest, and claims that if any such agreement was made it was not in writing, signed by the defendant, as required by the statute, and was therefore void and of no effect. It also sets up the delays and *laches* of the complainants as a bar to the suit.

In addition to what has already been stated, the said answer contains this further matter of defense: "That at the time said lands were so conveyed by said Nathan M. Freer and Jeremiah Scanlan and wife to this defendant, the said lands were not worth to exceed $12,000; that before this defendant had received the said quitclaim deeds from said Nathan M. Freer and J. Scanlan he had advanced to Jeremiah Scanlan, at different times, large sums of money; that this defendant did not desire to make profit of his brother's misfortune, and in the month of October had an accounting and settlement with said Jeremiah Scanlan in Chicago, and he and this defendant then and there agreed upon the value of said land at that time, and also upon the amount that this defendant had advanced to said Jeremiah Scanlan, and the interest thereon, and also the amount he had paid out in purchase of said land from said Nathan M. Freer, and also the moneys laid out by this defendant in making repairs on said land, and also the amount laid out by this defendant in paying taxes and special assessments levied on said land; and this defendant then and there paid to the said Jeremiah Scanlan the difference between the amount so paid out and advanced by him and the value

of said land, as then and there agreed upon between the said Jeremiah Scanlan and this defendant, being the sum of $2100. And this defendant, further answering, says that said Jeremiah Scanlan, and his wife, Ann Scanlan, then and there, in consideration thereof, relinquished to this defendant all claims to said land." And it also contains this further statement in respect thereto: "That in the month of October, 1879, the said Jeremiah and his wife did release and quitclaim to this defendant all their interest in said property, by writing subscribed by them, and for full consideration."

Replications were filed, and upon the hearing of the cause in the circuit court of Cook county, a decree was entered dismissing both the original bill and the cross-bill for want of equity, and that decree was afterwards affirmed by the Appellate Court for the First District, and the cause was then brought here by this appeal.

Mr. W. T. Burgess, and Mr. James E. Munroe, for the appellants:

A trustee can not purchase at his own sale, either directly or indirectly. *Howard* v. *Ames,* 3 Metc. 308; *Litchfield* v. *Cudworth,* 15 Pick. 30; *Harper* v. *Ely,* 56 Ill. 179.

Appellee acquired, by the deeds from Nathan M. Freer and Jeremiah Scanlan and his wife, no different title to the land than Nathan M. Freer had, but he by those deeds became a mere trustee or mortgagee, holding the title as security for his advances for Jeremiah to L. C. P. Freer.

As to the facts tending to show the transaction a mere loan and security, see *Miller* v. *Thomas,* 14 Ill. 428; *Eiland* v. *Radford,* 7 Ala. 724; *Turnipseed* v. *Cunningham,* 16 id. 506; *Davis* v. *Stonestreet,* 4 Ind. 106; *Morris* v. *Nixon,* 1 How. 126.

Inadequacy of price as evidence of a loan: *Campbell* v. *Dearborn,* 109 Mass. 144; *Russell* v. *Southard,* 12 How. 139.

The fact that Jeremiah remained in possession of the property after the apparent conveyance of the title to Timothy,

without paying or agreeing to pay rent, is another cogent circumstance to show the transaction a mortgage. *Campbell* v. *Dearborn*, 109 Mass. 145; *Flagg* v. *Mann*, 2 Sumner, 490; 1 Jones on Mortgages, (3d ed.) sec. 328.

Why were the evidences of Jeremiah's indebtedness delivered to Timothy, if Timothy bought absolutely? The two $1000 notes were, as before noted, delivered to him uncanceled. This circumstance goes far to show that Timothy was a mere lender of money upon the security of the deeds made to him. *Ennor* v. *Thompson*, 46 Ill. 215; *Sutphen* v. *Cushman*, 35 id. 187.

Timothy and Jeremiah were brothers. It can not be presumed that Timothy, who before had shown a disposition to aid his needy brother, bought this property of him for less than half its value. The relationship of the parties is an additional circumstance in favor of a loan.

The transaction of October 29, 1879, did not cut off the equity of redemption of Jeremiah and his wife in the land. 1 Jones on Mortgages, sec. 251; *Peugh* v. *Davis*, 6 Otto, 332; *Dougherty* v. *McColgan*, 6 Gill & J. 282; *Linnell* v. *Lyford*, 72 Me. 283.

As to dealings between a trustee and *cestui que trust*, see *Thorp* v. *McCullum*, 1 Gilm. 626; *Michaud* v. *Girod*, 4 How. 556.

The relation of Timothy and Jeremiah, under the deeds of May, 1879, touching the land in question, was that of trustee and *cestui que trust*. *Babcock* v. *Wyman*, 19 How. 289.

The denial by a trustee of the trust relation is a breach of trust,—"a fraud of the most flagrant kind,"—and so taints with fraud all dealings with his *cestui que trust*, then or subsequent thereto, into which that denial enters. *Taylor* v. *Luther*, 2 Sumn. 228.

The adequacy or inadequacy of what was paid by Timothy, the trustee, to Jeremiah, the *cestui que trust*, is of no consequence, whether he makes advantage or not. If the connection (trusteeship) does not satisfactorily appear to have been

dissolved, it is in the choice of the *cestui que trust* whether they will take back the property or not. *Ex parte Lacey,* 6 Ves. 625; *Morse* v. *Royal,* 12 id. 372; *Coles* v. *Trecothick,* 9 id. 234; *Ayliffe* v. *Murray,* 1 Atk. 58; *Downes* v. *Grazebrook,* 3 Mer. 201; *Brown* v. *Cowell,* 116 Mass. 461; *Farnam* v. *Brooks,* 9 Pick. 212.

Inconsistent defenses can not be set up in an answer. *Stone* v. *Moore,* 26 Ill. 172; *Westlake* v. *Horton,* 85 id. 228; *Walton* v. *Walton,* 70 id. 142; *Cummins* v. *Cummins,* 15 id. 34; *Lynn* v. *Lynn,* 5 Gilm. 622; 1 Daniell's Ch. Pr. 713.

Messrs. SMITH & PENCE, and Mr. THOMAS J. WALSH, for the appellee:

In May, 1879, the $4000 note had been canceled. By the payment made by Timothy, the two other notes, of $1000 each, secured by the deeds of trust of 1875 and 1876, were extinguished. After that, Jeremiah was not a debtor. A subsisting debt is essential to the existence of a mortgage. *Rue* v. *Dole,* 107 Ill. 275.

There was no inadequacy of consideration. The price indicates neither fraud, imposition, nor undue influence. Story's Eq. Jur. secs. 244-246; *Weld* v. *Rees,* 48 Ill. 428; *Jenkins* v. *Pierce,* 98 id. 646; *Magnusson* v. *Williams,* 111 id. 450; Kerr on Fraud, 186; 2 Pomeroy's Eq. Jur. sec. 927; Bispham's Principles of Eq. sec. 219; *Berry* v. *Lovi,* 107 Ill. 612; *Henderson* v. *Sublett,* 21 Ala. 630.

The draft itself was sufficient to bar or to estop Jeremiah. The receipt which Mrs. Scanlan signed was sufficient to bar her dower. *West* v. *Reed,* 55 Ill. 242; *Seymour* v. *Mackay,* 126 id. 341; Rev. Stat. title "Conveyances," secs. 18, 19; Rev. Stat. title "Husband and Wife," sec. 6.

The transaction does not show that appellee held the property as a mortgagee. *Stephenson* v. *Thompson,* 13 Ill. 186; *Smith* v. *Sackett,* 15 id. 531; *Davis* v. *Hopkins,* 15 id. 519; *Taintor* v. *Keys,* 43 id. 332.

A trustee may purchase of the *cestui que trust,* if done fairly, in good faith, and for an adequate consideration. *Brown* v. *Cowell,* 116 Mass. 161; *Ex parte Lacey,* 6 Ves. 625; *Ayliff* v. *Murray,* 2 Atk. 58; *Downes* v. *Grazebrook,* 3 Mer. 200; *Morse* v. *Royal,* 12 Ves. 355; *Coles* v. *Trecothick,* 9 Ves. 246.

Mr. Justice Baker delivered the opinion of the Court:

We are entirely satisfied, from the evidence in this cause, that L. C. P. Freer, the trustee in the trust deed of 1874, when he advertised and sold the premises in controversy, under the power contained therein, in fact struck off and sold the same to himself; that he was the real purchaser, and his son, Nathan M. Freer, only the nominal purchaser. It is also manifest, from the proofs, that it was intended by all parties concerned that such sale should not bar the equity of redemption owned by Jeremiah Scanlan, but that it was made simply for the purpose of freeing the equity of redemption from the liens of certain judgments that had been theretofore recovered against said Jeremiah, and that it was the understanding, both before and after the sale, that, notwithstanding such sale, and the deed made in pursuance thereof, said Jeremiah might redeem by paying the amount due upon the several notes and mortgages, together with taxes, expenses and interest. The effect, therefore, of the trustee's deed to Nathan M. Freer was merely to put the legal title in the latter, to be held under the same trusts that it was subject to while vested in the original trustee, and the equity of redemption was not cut off, but still subsisted. We furthermore think that the proofs conclusively show that the appellee, Timothy H. Scanlan, took his quitclaim deed from Nathan M. Freer, and paid the indebtedness due to L. C. P. Freer, with full knowledge of the rights and equities of his brother, Jeremiah, in the premises conveyed, and that he did so at the special instance and request of Jeremiah, and for the express purpose of affording the latter a better opportunity

than it was feared the Freers would allow for either clearing the property from the incumbrances which were upon it, or for disposing of it in such manner as would realize a pecuniary benefit to Jeremiah over and above the incumbrances.

The fact that appellee and Jeremiah were brothers, and that the former had; a short time prior to the transactions here involved, loaned the latter $1000 to apply on interest and taxes; the fact that immediately before the execution of the two quitclaim deeds Jeremiah had again applied to him for pecuniary assistance and for a loan, and that in response to such application he had come all the way from Galveston, Texas, to Chicago; the fact that the consideration money paid L. C. P. Freer ($7033.56) for the conveyance from Nathan M. Freer was the exact amount due upon the incumbrances, and was grossly inadequate to the value of the land, it being admitted by appellee its value was $12,000;·the fact that the notes for $4000, for $1000, and for $1000, respectively, with the trust deeds securing them, were delivered to Timothy H.; the fact that Jeremiah and his wife quitclaimed to Timothy H. without the payment of any consideration therefor; the fact that Jeremiah continued in possession of the house and premises without paying or agreeing to pay rent; and the admission of appellee, in his answer, that on October 29 following he "had an accounting and settlement with Jeremiah," that he then paid to Jeremiah and his wife $2100, in consideration of their relinquishing to him "all claim to said land," and that they did then "release and quitclaim * * * all their interest in said property, by writing subscribed by them, and for full consideration,"—are circumstances which conclusively establish that the conveyances to appellee, although absolute upon their faces, were in fact a mortgage, and conveyed the legal title to appellee in trust, to pay out of the proceeds of the property his advances to Jeremiah and to the Freers, with interest, and account to Jeremiah for the residue, or, in case of full payment to him by Jeremiah of the amount due him, to

reconvey to Jeremiah. A deed absolute in form, if intended as a security, is, in equity, but a mortgage, and will be treated and enforced as such, even though the agreement for redemption rests only in parol, and notwithstanding the Statute of Frauds. *Union Mutual Life Ins. Co.* v. *White*, 106 Ill. 67.

A defendant to a bill in chancery may set up any number of defenses in his answer, but the defenses must be consistent with each other. (*Stone* v. *Moore*, 26 Ill. 165; 2 Daniell's Ch. Pr. 815, 816.) The defenses here interposed by appellee to the original bill were inconsistent with each other; but then, no exceptions were filed thereto on that account. We take it, that where inconsistent defenses are set up in an answer, and such answer is not excepted to, and on the hearing one of the defenses pleaded is found to be untrue and the other is established by the proofs, the decree will not be reversed on account of the interposition of such untrue and inconsistent defense.

The denial by a trustee of the trust relation is a breach of trust and a flagrant fraud. Appellee has in his answer denied the trust relation which we find existed between himself and his deceased brother, and has sought, by pleading the Statute of Frauds, and in various other ways, to avoid the consequences of the existence of such relation. By falsely claiming he was not a mortgagee or trustee he has undoubtedly placed himself in an unenviable attitude, and one which has a tendency to justly arouse the suspicions of the court in respect to the merits of his case. We find, however, in the record, no evidence which would justify the conclusion, or even a reasonable suspicion, that appellee ever denied he was mortgagee or trustee, prior to the time he conceived it was expedient so to do in defense of this suit. In fact, the evidence tends strongly to show that he recognized and admitted the existence of an equity of redemption in his brother until after the arrangement of October 29, 1879, hereinafter mentioned. We understand the doctrine to be, that the denial by a trustee of the trust relation is a fraud, which taints with fraud all his deal-

ings with his *cestui que trust* which transpire at the time of
such denial or subsequent thereto, and into which such denial
enters. (*Taylor* v. *Luther*, 2 Sumn. 228.) But we can not see
how a fraudulent denial, made after the institution of this suit
in 1887, could possibly enter as an element into a settlement
and arrangement made in 1879, and fully completed and car-
ried into effect at that time.

Did appellee, on or about October 29, 1879, purchase from
Jeremiah Scanlan his equity of redemption, and if so, was the
arrangement then made such, that in view of the relations
then existing between them it should be regarded as valid and
binding upon said Jeremiah and his heirs?

In respect to the question of fact involved, we have no doubt,
from the evidence, but that appellee bought and paid for the
equity of redemption. The testimony of Albert Archer and
others shows that in the summer and fall of 1879 Jeremiah
was in poor health and in straightened circumstances, and was
anxious to sell and dispose of the property. The testimony
of Nathan M. Freer shows that on October 29, 1879, appellee
was in Chicago, and came with Jeremiah to his office, and that
he, at their request, drew a paper in the nature of a receipt
for a settlement; that Jeremiah signed it there, and that it
was taken by one of them for the purpose of getting Mrs. Scan-
lan to sign it. The testimony of Marcus Stearns shows that
he presented the paper to Mrs. Ann Scanlan, and that she
signed it, and that thereupon he handed her a piece of New
York exchange. The testimony of appellee shows that said
paper was destroyed by fire in 1882, and that it was a receipt,
signed by Jeremiah and Ann Scanlan, for $2100, in full of
all claims against the property. The New York draft, which
is in evidence, shows that it was made payable, by the indorse-
ment of T. H. Scanlan, to the order of Jeremiah Scanlan, and
that it was by Jeremiah indorsed to J. M. Adsit, banker, and
by Adsit collected through the National Park Bank. The
testimony of Morris Salkey shows that he was tenant of a por-

tion of the building on the land, and that Jeremiah introduced Timothy H. to him as the owner of the building. The testimony of Patrick Nolan and of Kate Scanlan shows that Jeremiah told them he had sold the property to appellee. And the testimony of Daniel T. and Clement J. Kinsella shows that they, as the agents of appellee, collected rents for the premises from January, 1880.

In respect to the rule which obtains in the matter of a purchase by a trustee, we understand it to be this: that a trustee can not buy from himself, but that he may buy from his *cestui que trust,* provided that he so deals with the *cestui que trust* that he shakes off the obligation which attaches to him as trustee. *Fox* v. *Macreth,* 1 Lead. Cases in Eq. (4th Am. ed.) 188, and cases cited in notes; *Ex parte Lacey,* 6 Ves. 625.

In *West et al.* v. *Reed,* 55 Ill. 242, it was held, that while contracts between mortgagor and mortgagee for the purchase or extinguishment of the equity of redemption are regarded with jealousy by courts of equity, and will be set aside if the mortgagee has in any way availed himself of his position to obtain an advantage over the mortgagor, yet this principle does not preclude any *bona fide* agreement between the parties which should operate to vest the entire estate in the premises in the mortgagee, and that mere inadequacy of consideration will not, of itself, deprive such agreement of its binding effect. In that case, however, while the conveyance from the mortgagor was an absolute deed, yet the assignor of West had executed to the mortgagor a separate instrument of defeasance, while here the defeasance rested solely in parol, and without any writing to show it. So we think a somewhat stricter rule should be here applied, as against the mortgagee and trustee, than was held in *West* v. *Reed.* Here, the mortgagor is dead and the mortgagee is not a competent witness; but, as we have already stated, the circumstances in evidence indicate that the mortgagee, at the date of the transaction, fully admitted the equitable rights of the mortgagor. It is also mani-

fest that the mortgagor, who was living upon the premises, knew much better than the mortgagee, who was a resident of a distant State, the value of the property. There is no ground, then, for any surmise that there was any concealment, or advantage taken of information acquired in the character of trustee. The only room there was for fraud was that appellee repudiated the position of mortgagee, and thereby fraudulently forced his brother to a settlement on his own terms. If the price given was inadequate, it might afford occasion for a claim such was the case. But we do not find that there is evidence to reasonably justify a conclusion the price was inadequate. Jeremiah himself knew better than any one else the value of the premises, and he was, in the summer or early fall, entirely willing they should be sold for $11,500, subject to the State street assessment and the taxes of 1879. L. C. P. Freer, whose only security for some $7000 was his liens on the property, considered it then worth about $12,000, and "possibly a little more." George M. Bogue places the then value at $12,400. J. H. Gray, agreeing with all the other witnesses except Kerfoot, values the land at $300 a foot. Archer offered $11,500, and considered it a bargain, but expected to pay, in addition, the taxes and assessments, making a total of $12,639. S. H. Kerfoot makes the valuation altogether higher than the other witnesses do. He bases his opinion upon an examination made in 1888, and thinks the land was in 1879 worth $350 per foot, and the buildings worth $10,000, making a total of $18,025. The weight of the evidence, as a whole, would put the then value at some $12,500. The amounts settled by appellee with Freer, the taxes and assessments paid and assumed, the amount paid for finishing the upper floor, the $1000 loaned to Jeremiah, and the draft for $2100, form an aggregate of $11,974.26 that the property cost appellee. The borrowed moneys which he paid Freer were drawing ten per cent interest, and it is not unlikely the arrangement between the brothers was, that the amounts paid in cash by appellee

should bear the same rate of interest, and if so, the interest to October 29 would make some $450 more, making the aggregate consideration less than $100 below the value of the property. Besides this, appellee was at the trouble and expense of two trips from Galveston, Texas, to Chicago, in looking after the property, and it is quite likely the arrangement, in the first instance, was, that he should receive some compensation for his trouble and expenses. It must also be borne in mind, that the parties made no record of the details of their settlement, and neither of them can testify in respect thereto, and that this suit was not brought until some eight years thereafter.

After the settlement, Jeremiah informed Nolan, who was an old and intimate friend, that his brother had given him $500 more for the property than anybody else would give. Archer had offered, including taxes and assessments, the sum of $12,639, and $500 additional to this would make the consideration $13,139. This would indicate there was about $700 of consideration that entered into the accounting that is not identified by the testimony, and in what it consisted it is not possible, owing to the death of Jeremiah, now to ascertain. The evidence shows that in 1879, and prior thereto, there was but little demand for State street property in the vicinity of No. 424, and that it was depressed in value, but that since then it has very greatly increased in value. After a careful examination of all the testimony, and after giving due weight to the fact appellee was a mortgagee and trustee, and his conduct therefore to be regarded with jealous scrutiny, we are of opinion we could not, under all the circumstances of the case, fairly and reasonably say that the consideration for the equity of redemption was inadequate, or justly impute fraud to him. Here there was no marked under-valuation of the property, but, on the contrary thereof, the consideration would be deemed reasonable if the transaction had been between other parties.

Two other circumstances are relied upon by appellants as warranting an imputation of fraud and compulsion.    One of them is, that both of the parties, in the correspondence which passed between them, referred to the transaction of May, 1879, as a *purchase* by appellee of the property, instead of designating it as a mortgage thereof to him; and the other is, that appellee, before he left his home in Texas, made up his mind just how much he would give for the equity of redemption, as indicated by his then purchasing New York exchange for $2100. In respect to the first of these circumstances it may be said, it was the most natural thing in the world for the brothers to speak of the transactions of May, wherein absolute deeds were made to appellee, as a purchase, and it would be far-fetched and unreasonable to deduce therefrom an imputation of fraudulent intent.    In respect to the other, it is of more weight; but in view of the facts that Jeremiah was willing to close out the property upon the offer made by Archer, that frequent letters passed between Jeremiah and appellee, and the latter presumably knew of such offer, and also knew of the state of accounts between himself and Jeremiah, and that appellee admittedly gave $500 more than Archer would give, we think the circumstance in question would not indicate fraud or duress, but rather a willingness to give more for the equity than could be procured from others.    The jealousy with which transactions between mortgagor and mortgagee, or trustee and *cestui que trust,* are regarded, should not be extended beyond the bounds of reason, and so as to unnecessarily and unjustly interfere with the common business transactions of men.

Where a mortgage is in the form of an absolute conveyance, a *bona fide* agreement between the parties to vest the entire estate in the mortgagee will be sustained, and the execution of a formal deed will not be required, provided the transaction is fair, and not attended with oppression or fraud or undue influence, and the mortgagee has not availed himself of his position to obtain an advantage over the mortgagor.    *West* v.

*Reed,* 55 Ill. 242; *Carpenter* v. *Carpenter,* 70 id. 457; *Seymour* v. *Mackay,* 126 id. 341.

Although we would be better satisfied with the result if appellee had not denied in his answer (which, however, the oath being waived, was a mere pleading,) that he was mortgagee and trustee, and if there was within reach positive evidence of just what the amount of the consideration agreed upon was, and an itemized statement showing with exactness how it was settled for in the accounting, yet we do not feel that sufficient appears in this record to justify us in upsetting the conclusion reached by the courts below. The circumstance that Jeremiah did not in his lifetime seek to impeach the settlement, and the further circumstance that appellants made no complaint until nearly seven years after his death, and until the property had very greatly increased in value, are also entitled to some weight.

In respect to the cross-bill of Ann Scanlan, suffice it to say, that she waived her right of dower when she joined in the execution of the deed of May 2, 1879; that notwithstanding her denial, it sufficiently appears from the testimony of Nathan M. Freer, Marcus J. Stearns, and the receipt which she signed, and her subsequent conduct, that she released her inchoate right of dower in the equity of redemption, and that the consideration therefor was included in the draft which was made payable by indorsement to her husband.

In view of all the circumstances of the case we think it would be inequitable to allow a redemption from the mortgage.

The judgment of the Appellate Court, and the decree of the circuit court dismissing the original bill and the cross-bill, are affirmed.

*Judgment affirmed.*